***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award:
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction over this matter.
2. An employee-employer relationship existed between the parties on May 19, 2007. *Page 3 
3. Plaintiff suffered a compensable injury by accident to his right leg arising out of and in the course of his employment with defendant-employer on May 19, 2007.
4. There is no question as to the misjoinder or nonjoinder of any parties.
5. Defendant-employer is insured and their claims are administered by Key Risk Management Services.
6. The parties stipulated to a number of exhibits into evidence, including:
 a. Stipulated Exhibit 1: Pre-Trial Agreement;
 b. Stipulated Exhibit 2: I.C. Forms, Medical Records, Wage and Tax Statements.
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Ledford's March 16, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. What is plaintiff's applicable average weekly wage? Plaintiff contends that he was a "volunteer" firefighter such that his average weekly wage should be determined by reference to his earnings with the Asheville Fire Department pursuant to Dereberry v. Pitt CountyFire Marshall, 318 N.C. 192, 347 S.E.2d 814 (1986) andWard v. Long Beach Volunteer Rescue Squad,151 N.C. App. 717, 568 S.E.2d 626 (2002). Defendants contend that plaintiff was not a volunteer but was a paid part-time employee, such that Dereberry is not applicable.
2. Whether plaintiff's back pain is causally related to his compensable right leg injury.
3. Whether compensation is due and payable to plaintiff for permanent impairment to his right leg due to the injury by accident.
4. What, if any, further compensation is due.
 ***********
Based upon the preponderance all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, plaintiff was 34 years of age. Plaintiff has worked for the Asheville Fire Department since February 14, 2005. Plaintiff began working part-time with the Jupiter Volunteer Fire Department on March 2, 2007. At the time of hearing, plaintiff was also working as a volunteer firefighter for the Mars Hill Fire Department.
2. Plaintiff worked full time for the Asheville Fire Department. Plaintiff's 2007 Asheville Fire Department W-2 form indicated he earned $30,025.62 as a firefighter. Plaintiff also worked for defendant-employer part-time as a firefighter. Plaintiff earned $8.00 an hour working 10 hour shifts for defendant-employer Jupiter Volunteer Fire Department. Plaintiff's 2007 Jupiter Volunteer Fire Department W-2 form indicated that he earned $4,832.00 as a part-time firefighter. Plaintiff principally earned his wages while working for the Asheville Fire Department.
3. Plaintiff first began to work for defendant-employer on March 2, 2007. He was paid for the work he did for the fire department. Per the testimony of Captain Darryl Bartlett, the Jupiter Volunteer Fire Department had three different categories of firefighters: nine (9) full-time employees, seven (7) part-time employees, and seventeen (17) volunteer members. Part-time *Page 4 
firefighters had the same duties as full-time fire fighters, and were paid on an hourly basis for the shifts that they worked.
4. Plaintiff was one of the seven part-time employees. Plaintiff was paid $8.00 per hour for his activities as a firefighter for defendant-employer. He was paid by check and received a W-2 form from defendant-employer at the end of the year. The Full Commission finds based upon the preponderance of the evidence from the entire record that plaintiff was not a volunteer firefighter, and further finds that plaintiff was a part-time employee.
5. On May 19, 2007, plaintiff participated in a training exercise with live burning of houses. Various fire departments participated, and the exercise was run by the Weaverville Fire Department; the French Broad Volunteer Fire Department also participated.
6. Per plaintiff's testimony, such training is necessary to keep up his firefighter certifications, specifically Firefighter I and II certifications and EMT certifications, and he would need such training for his work with both the Jupiter Volunteer Fire Department and the Asheville Fire Department. Plaintiff was not required to participate in this particular training exercise and he was not paid for the training on May 19, 2007, by either the Jupiter Volunteer Fire Department or the Asheville Fire Department.
7. As Captain Bartlett testified, no employees of defendant-employer were paid for the training on May 19, 2007, unless they were otherwise scheduled to work. Plaintiff was not scheduled to work on May 19, 2007. The Jupiter Volunteer Fire Department did not schedule or run the training on May 19, 2007, although some of their firefighters participated.
8. As plaintiff was going through the house to make sure the fire was out, he tripped into a pallet and his foot went through the boards of the pallet. Plaintiff sustained an injury to his right leg. Defendants accepted plaintiff's *Page 5 
right leg claim as compensable. The Industrial Commission Form 60 accepting the claim was completed on May 29, 2007.
9. Plaintiff was taken to Mission Hospitals for treatment. Plaintiff was assessed with "a torsion injury to his right lower leg. He comes in with a spiral fracture of his right distal tibia and a comminuted fracture of the right distal fibula."
10. Dr. Gordon Groh, Chief of Trauma Surgery at Mission Hospitals, admitted plaintiff for surgery. Plaintiff underwent an open reduction internal fixation, intramedullary nailing of the right tibia fracture, and open reduction internal fixation of the right distal fibula fracture. The operative notes state that "Intraoperative radiographs were taken. Excellent reduction was noted although not completely anatomic. He had about 3 mm probably of overlap of his fracture site." Plaintiff remained in the hospital until May 21, 2007, when he was discharged in good condition.
11. Plaintiff returned to Dr. Groh's office on June 4, 2007. At that time Dr. Groh released plaintiff to return to work at sit down duties only, and plaintiff was to return in six weeks for new x-rays. Dr. Groh also assigned restrictions: "No climbing of stairs/ladders, No use of clutch, and No driving no greater than 1 hr/day, Limited weight bearing, No kneeling or squatting."
12. Plaintiff was seen again by Dr. Groh on July 6, 2007. The x-rays showed ". . .good anatomic alignment." Dr. Groh wanted him to ". . .wean off his crutches, continue to use his CAM walker. . .and return in six weeks. . ."
13. Plaintiff had another follow up appointment on August 20, 2007. New x-rays showed ". . .good interval healing of his tibia fracture and fibular fracture. . ." Dr. Groh kept *Page 6 
plaintiff limited at work duties such as "No kneeling or squatting, No climbing of stairs/ladder, Allow alternate sitting and standing." Plaintiff was also assigned physical therapy.
14. Plaintiff participated in physical therapy at Blue Ridge Physical Therapy from August 22, 2007 to September 27, 2007. Plaintiff returned to Dr. Groh on September 28, 2007, at which time plaintiff was released to return to full duty work. Plaintiff returned to work with the Jupiter Volunteer Fire Department on October 5, 2007.
15. Plaintiff's final visit with Dr. Groh was on November 12, 2007. The x-rays showed plaintiff had complete union of the fracture sites. Dr. Groh determined that plaintiff ". . .should leave his future medical management open in terms of potential need for hardware removal." He found that plaintiff did have "a little bit of sensitivity along his plate from his fibula." Dr. Groh assessed plaintiff with a fifteen percent permanent impairment (15% PPI) of his right leg.
16. On May 8, 2008, Dr. Stephen Shaffer of Southeastern Orthopedic Evaluation Centers examined plaintiff at plaintiff's request for a second opinion on his permanent impairment rating. Plaintiff complained of "continued soreness at both fracture sites with occasional swelling particularly in the tibial one after being up on the leg for long periods of time." Plaintiff also told Dr. Shaffer that "the right foot is externally rotated."
17. Upon examination, Dr. Shaffer found plaintiff's right leg stable with no indications of giving way. Plaintiff was able to ascend and descend stairs satisfactorily. Dr. Shaffer also noted that "patient continues to work presently as a full-time firefighter for the Asheville Fire Department and part-time at Jupiter Volunteer Fire Department." Dr. Shaffer noted in his record a "clinical measurement revealing ¼ inch shortening of the right tibia." *Page 7 
Dr. Shaffer also noted the right foot being rotated 15-20 degrees more than the usual pattern of the opposite foot and ankle. Dr. Shaffer assessed plaintiff with a twenty-two percent permanent impairment (22% PPI) of his right leg. Dr. Shaffer's notes explain that he considered the rotation important in assessing permanent impairment and that an additional four percent was assigned due to the shortening of the leg. Dr. Shaffer did not testify in this matter and there is no further explanation about how he performed a "clinical measurement" of plaintiff's legs.
18. Plaintiff was also seen by Dr. Elizabeth Gardner, an internal medicine specialist, who first saw him on October 29, 2008. Per Dr. Gardner's testimony, plaintiff had multiple complaints, including high blood pressure, chest pain, and back pain. However, Dr. Gardner did not specifically address his back complaints at that time.
19. On April 22, 2009, plaintiff returned to Dr. Gardner complaining of back pain radiating down his right leg, which he reported had been an intermittent problem for the past year or so since he had broken his right leg. Plaintiff told Dr. Gardner that he believed his back pain was due to a leg length discrepancy since the fracture, and that he had been under chiropractic care which did not provide him relief. Dr. Gardner stated in her record that she agreed with plaintiff ". . .and I suspect that his back pain is likely due to leg length discrepancy."
20. Dr. Gardner's physical examination showed that plaintiff's reflexes at the knee and ankle were normal, that plaintiff had a negative straight leg raising test, and normal muscle tone in the legs, indicating there was most likely no herniated disc. Dr. Gardner ordered x-rays of plaintiff's back, which were normal.
21. Per Dr. Gardner's testimony, she is not trained in measuring leg discrepancies, and therefore she did not measure plaintiff's leg length. It appears that she relied upon Dr. Shaffer's assessment. Dr. Gardner was taught in medical school that if there is a leg length discrepancy of greater than three centimeters, it could cause back pain, and that if the leg length discrepancy is less than three centimeters, it would be less likely to cause back pain. *Page 8 
22. William J. Kraak, PA-C, saw plaintiff on one occasion for low back pain on June 30, 2009. Mr. Kraak thought that plaintiff may have a herniated disc. Mr. Kraak noted a slight pelvic obliquity on x-ray. No opinion regarding the significance of this is indicated. Mr. Kraak did not indicate any causation opinion in his medical record.
23. Dr. Gordon Groh was plaintiff's treating orthopedic surgeon. Dr. Groh testified that plaintiff had an essentially anatomic reduction of his right leg fracture. Dr. Groh performed surgical reduction and internal fixation of plaintiff's right leg fracture on May 19, 2007. Plaintiff did not have any complications from the open reduction internal fixation. Dr. Groh testified that plaintiff's fracture healed in an anatomic position. Dr. Groh testified that, in layman's terms, anatomic positioning means that it is "lined up." When Dr. Groh says "lined up," he means that the fracture healed in the same position as it was prior to the fracture.
24. Dr. Groh admitted that when an orthopedic surgeon says "anatomic alignment," there can be discrepancies of a couple of millimeters between the final result and preoperative radiographs. In Dr. Groh's opinion, a couple of millimeters between post-operative and preoperative radiographs would not be significant. Dr. Groh did not notice any sort of leg length discrepancy in his treatment or from looking at the radiographs on the date of his deposition. Dr. Groh found no evidence that plaintiff had any more than two (2) millimeters at most difference post-operatively.
25. It is Dr. Groh's opinion, and the Full Commission finds the same as fact, that data on the relationship of leg length discrepancy to back pain is "mixed." Dr. Groh testified that a leg length discrepancy would only be significant if it was over 2.5 centimeters in a malunion. *Page 9 
Dr. Groh noted that the difference between plaintiff's leg before and after the fracture was like the difference between having "a new car that has been on the lot for 30 days versus one that came right off the factory line." Dr. Groh testified that his 15% PPD rating to plaintiff's right leg was to reasonable degree of medical certainty and based on the Industrial Commission Guidelines.
26. Dr. Frank J. Rowan, of Guilford Orthopaedic and Sports Medicine Center, prepared a report in regards to plaintiff's right tibia/fibula fracture. Dr. Rowan is a board certified orthopedic surgeon who is licensed to practice in North Carolina. Dr. Rowan reviewed medical records of Dr. Gordon Groh, Dr. Stephen Shaffer, and Dr. Elizabeth Gardner. He reviewed the actual film of the x-rays of plaintiff's right leg taken on November 12, 2007. Dr. Rowan also reviewed the emergency room and operating room notes. Dr. Rowan then prepared a report dated April 11, 2010, in which he responded to particular questions propounded by defendants' counsel.
27. In regards to the findings noted in Dr. Shaffer's report, Dr. Rowan noted that Dr. Shaffer had indicated a leg length discrepancy which plaintiff alleged has caused his current back pain. Dr. Rowan did not agree with Dr. Shaffer's assessment that plaintiff has a leg length discrepancy. Dr. Rowan testified that the x-rays reveal that both plaintiff's right distal tibia and fibula fracture were healed, and that the fibula fracture was healed in an anatomic position. He noted that "the fracture pieces were brought back together anatomically and there can be no shortening or rotation of the leg based on the position of the healed fibula fracture."
28. Although he did not examine plaintiff, from his review of the medical records and the x-ray, Dr. Rowan formed an opinion that plaintiff did not have a leg length discrepancy, his opinion to a reasonable degree of medical certainty. He concluded that plaintiff did not have an altered gait and that plaintiff's current back condition could not be related to a leg length *Page 10 
discrepancy that does not exist. Dr. Rowan testified that Dr. Shaffer likely used a tape measure to measure plaintiff's leg length, which would not be accurate and could be off by up to one-half (½) inch.
29. Dr. Rowan testified "in nature you can have a difference up to about twelve millimeters from side to side regarding total leg length and not even know it." Dr. Rowan noted that there was no leg length discrepancy that would cause back pain.
30. The medical evidence has been carefully considered. In weighing the medical evidence as to any leg length discrepancy, the Full Commission assigns greater weight to the opinions expressed by Dr. Groh, as the treating orthopedic surgeon, and to Dr. Rowan, who is also an orthopedic specialist, and less weight to the opinions of Dr. Gardner, who is not an orthopedic specialist, and did not actually measure plaintiff's legs, or to Dr. Shaffer, who did not testify in the case. Dr. Shaffer's opinion about a leg length discrepancy is given less weight because there is no clear explanation in his notes or otherwise of record, of how he conducted a measurement of the same.
31. In weighing the medical evidence about whether plaintiff's right leg is now rotated, the opinion of Dr. Shaffer that the right leg is now rotated 15-20 degrees more than the usual pattern of the opposite foot and ankle, is given consideration. Dr. Shaffer's assessment of rotation is contradicted by Dr. Rowan's testimony, however Dr. Rowan did not examine plaintiff. Dr. Shaffer's assessment of rotation is slightly supported by the observation of PA-C William Kraak that there appeared to be mild listing to the left of the lumbar spine on x-rays. Plaintiff was sent to Dr. Shaffer for the specific purpose of a second opinion as to any permanent impairment, and Dr. Shaffer assigned the twenty-two percent (22%) rating, part of which took into consideration the external rotation and the shortened leg length as assessed by Dr. Shaffer. *Page 11 
32. Considering the differences in opinion between Dr. Groh and Dr. Shaffer as to plaintiff's permanent impairment, some weight is given to the assessment of Dr. Shaffer that the rotation of the leg should be considered in the impairment rating. The evidence therefore would indicate that an average of the two ratings would be the most accurate assessment of plaintiff's actual permanent impairment. It is found therefore that averaging the two ratings establishes that plaintiff has an eighteen and one-half percent (18.5%) permanent impairment to his right leg.
33. Defendants have provided medical treatment for plaintiff's compensable injuries to his right leg. Based upon a preponderance of the medical evidence, plaintiff has failed to establish that he developed back pain due to his right leg injury
34. Plaintiff's right leg injury that is the subject of this claim arose out of and in the course of his paid, part-time employment as a firefighter for defendant-employer. Plaintiff was not acting as a "volunteer fireman" at the time of his injury by accident.
35. There is no basis upon which to treat the plaintiff differently than other similarly situated, part-time, wage earning employees for purposes of calculating his compensation rate under the Workers' Compensation Act.
36. As evidenced by the Form 22, plaintiff earned $3184.00 with the Jupiter Volunteer Fire Department from March 2, 2007, through plaintiff's date of injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-2(5) reads, in part, as follows: "in case of disabling injury or death to a volunteer fireman; member of an organized rescue squad; an authorized pickup *Page 12 
Firefighter . . . a duly appointed and sworn member of an auxiliary police department . . . or senior members of the State Civil Patrol functioning under Article 11, Chapter 143 B of the General Statutes, under compensable circumstances, compensation payable shall be calculated upon the average weekly wage the volunteer fireman; member of an organized rescue squad; an authorized pickup firefighter . . . a duly appointed and sworn member of an auxiliary police department . . . was earning in the employment wherein he principally earned his livelihood as of the date of injury." N.C. Gen. Stat. § 97-2(5).
2. Based upon the preponderance of the evidence, plaintiff was paid wages as a part-time firefighter, such that his relationship with defendant-employer was as an employee and plaintiff was not a "volunteer" as contemplated within the coverage of the statute. Plaintiff's average weekly wage is not either the maximum compensation rate for the year of his injury or the employment in which he alleges to have principally earned his livelihood. Id.
3. On the date of his injury by accident, May 19, 2007, plaintiff was participating in a training exercise as an employee of defendant-employer. When an employee holds two separate jobs and is injured in one of them, his compensation rate is based only on his average weekly wages earned in the employment producing the injury.Joyner v. A.J. Carey Oil Co.,266 N.C. 519, 146 S.E.2d 447 (1966). The Full Commission therefore concludes that only plaintiff's wages earned while working for the Jupiter Volunteer Fire Department shall be used in calculating plaintiff's average weekly wage.
4. There are five methods of calculating an employee's average weekly wages under N.C. Gen. Stat. § 97-2(5). The first [1] method is calculated by totaling the employee's earnings "during the period of 52 weeks immediately preceding the date of the injury" and dividing it by 52. The second [2] method is used when the injured employee has "lost more than seven *Page 13 
consecutive calendar days at one or more times . . . although not in the same week" during the 52 weeks immediately preceding the date of the injury. The average weekly wage is then calculated by totaling the injured employee's earnings for the 52 weeks preceding the injury and dividing by the number of weeks remaining after the time lost has been deducted. The third [3] method is used "where the employment prior to the injury extended over a period of fewer than 52 weeks." The average weekly wage is then calculated by "dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages" provided that results are fair and just to both parties. The fourth [4] method is used "where, by reason of a shortness of time . . . or the casual nature or terms of his employment, it is impractical to compute the average weekly wage as above defined." In this situation, "regard shall be had to the average weekly wage which during the 52 weeks previous to the injury was being earned by a person of the, same grade and character employed in the same class of employment in the same locality or community." The fifth [5] method is used "where for exceptional reasons the foregoing would be unfair, either to the employer or employee." In this situation, "such other methods of computing average weekly wage may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury." This method "clearly may not be used unless there has been a finding that unjust results would occur by using the previously enumerated methods." N.C. Gen. Stat. § 97-2(5); McAninch v. Buncombe CountySchools, 347 N.C. 126, 489 S.E.2d 375 (1997).
5. As plaintiff was not a volunteer firefighter and worked less than 52 weeks for defendant-employer prior to his injury, the Full Commission concludes that plaintiff's average weekly wage should be calculated under the third method listed in N.C. Gen. § 97-2(5). Under the third [3] method, the average weekly wage is calculated by dividing the earnings during that *Page 14 
period by the number of weeks and parts thereof during which the employee earned wages for defendant-employer. As evidenced by the Form 22, plaintiff earned $3184.00 with the Jupiter Volunteer Fire Department from March 2, 2007 through plaintiff's date of injury. Using the aforementioned method, the Full Commission finds that plaintiff's average weekly wage is thus $293.26 per week which yields a compensation rate of $195.52. The Full Commission finds that these results are fair and just to both parties. Id.
6. Plaintiff has returned to work as a firefighter in his previous employment at the same or greater average weekly wage as of October 5, 2007. Plaintiff is entitled to temporary total disability from May 19, 2007 through October 4, 2007, at the rate of $195.52 per week. N.C. Gen. Stat. § 97-29.
7. As a consequence of his injury by accident, plaintiff has sustained an eighteen and one-half percent permanent impairment to his right leg (18.5% PPI) for which he is entitled to compensation for 37 weeks (200 x .185) pursuant to N.C. Gen. Stat. § 97-31(15).
8. "Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Based upon the preponderance of the medical evidence of record, plaintiff has failed to show that his alleged back complaints are causally related to the injury by accident. Click v. FreightCarriers, 300 N.C. 164, 265 S.E.2d 389 (1980).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD *Page 15 
1. Plaintiff is entitled to receive temporary total disability benefits at the rate of $195.52 per week from May 19, 2007, through October 5, 2007. Defendants shall pay any benefits not paid for this period and are entitled to a credit for any temporary total disability benefits already paid to plaintiff.
2. Defendants shall pay plaintiff compensation in the amount of $7234.24 (37 weeks x $195.52 weekly compensation rate) for his eighteen and one-half percent (18.5%) permanent impairment to his right leg.
3. An attorney's fee of twenty-five percent (25%) of the net accrued compensation payable to plaintiff under paragraphs 1 and 2 above is approved for plaintiff's counsel.
4. Plaintiff's claim for medical compensation for his back complaints is hereby DENIED.
5. Defendants shall pay the costs.
This the 21st day of September, 2011.
 S/___________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/________________ STACI T. MEYER
COMMISSIONER *Page 16 
DISSENTING IN PART: S/____________________ BERNADINE S. BALLANCE COMMISSIONER *Page 17